for injuries caused by an accident. The plaintiff asked the trial court to charge that if the defendants have failed to produce witnesses who were in their employ, and were present at the time of the accident, that fact should be taken into consideration by the jury in coming to a conclusion. The court charged, in effect, that they might under certain conditions do so. This was held to be error, for which the judgment was reversed. In Fitzpatrick v. Woodruff, 47 N. Y. Super. Ct. 436, the court left it to the jury to say whether the failure of a party to produce a witness to the transaction, and who was sworn on another trial, could create an inference against him. This was held to be error, and the judgment of the trial court reversed. In Lewis v. Bache, 7 N. Y. Supp. 757, the general term of the New York common pleas held, in an action attacking a general assignment by partners as void for fraud, where promissory notes held by their wives were charged as firm liabilities, and their wives were not called as witnesses to show the bona fides of the assignments, that no inference against the validity of the assignment could be drawn from that fact. In Bleecker v. Johnston, 69 N. Y. 309, in an action against copartners upon an alleged contract of employment, plaintiff and one of the defendants were the only witnesses. Their testimony was directly in conflict. The trial judge charged, in substance, that it was the duty of the defendants to produce the other defendants as a witness, and, not having done so, the jury might infer that his evidence would have been prejudicial to the defendants. This was held to be error. As before stated, these cases all relate to the failure to produce witnesses, and, in so far as they tend to establish a rule as to when the witness must be produced to avoid the inference which the court or jury may draw from the failure to produce the witness, may aid us in the consideration of the question before us. Had the plaintiff failed to produce his daughter upon this trial, and it had appeared that she was present and in condition to have observed what occurred, and was in reach of subpœna, and could have been produced by the plaintiff, the question which the court had in mind in his charge to the jury in this case would have been before us, and the cases cited strictly applicable. But, as we have seen, this is not such a case, and we have considered it upon principle, and we hold that no inference against the plaintiff, under the circumstances, could be reasonably indulged in by the jury, and it was error to charge them to that effect.

These views lead to the conclusion that the judgment should be reversed, and a new trial granted, with costs to abide the event.

---

(5 App. Div. 11.)

MILLS v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, Fourth Department. April 18, 1896.)

1. ACCIDENT ON RAILROAD TRACK—CONTRIBUTORY NEGLIGENCE.
    Plaintiff, who was familiar with the surroundings, alighted from a train, at a village where it stopped only for coal and water, a short distance from the passenger station. Starting for the station, on another

track, while under the coal chute, which extended over the track, and left no room to get off at the sides, he was struck by a train coming from in front, and which he knew was due at about that time. The train could have been seen some distance ahead, but, just before being struck, smoke from an engine got in his eyes. There was also considerable noise from other engines, and it was impossible to move quickly, owing to the track's being wet from the water tank. *Held* that, as matter of law, he was guilty of contributory negligence.

2. SECONDARY EVIDENCE.
It is error to allow one to testify that he has a certificate, issued by the government, entitling him to ride on a train; he thus being permitted to prove by a conclusion the effect of an instrument, the absence of which has not been accounted for.

Appeal from circuit court, Wayne county.

Action by John Mills against the New York Central & Hudson River Railroad Company. From a judgment entered on a verdict for plaintiff, and an order denying a new trial, defendant appeals. Reversed.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, WARD, and GREEN, JJ.

Albert H. Harris, for appellant.
W. S. Jenney, for respondent.

WARD, J. The plaintiff's complaint alleges "that on the 7th day of August, 1892, the plaintiff was a passenger on one of defendant's trains from Albany to Lyons, Wayne county, New York; that upon the arrival of the said train at Lyons station the plaintiff got off at the usual and customary place for passengers to leave said train, in order to get therefrom to the depot; that thereupon said plaintiff proceeded to go by the usual and customary route from said train to said depot, and in so going was necessarily obliged to cross one track, and through and under the coal chute; that, while so doing, said defendant, by its agents and servants, carelessly, negligently, and recklessly ran another train, from the west, on the track crossed by said plaintiff, by the depot, towards and under said chute, and to said train from which plaintiff had just alighted, which was still standing where it had stopped when said plaintiff got off, and, in so doing, carelessly and negligently ran into and over said plaintiff, thereby mangling and crushing his left leg to such an extent that amputation became necessary,"—whereby the plaintiff demanded judgment for damages, etc. The leading facts in the case are undisputed. The plaintiff was a resident of Lyons, N. Y., where he had been engaged in various kinds of business. He was appointed a railway postal clerk by the United States government, by virtue of the following:

"Probationary Appointment.
"Post-Office Department. Office of the General Superintendent of the Railway Mail Service.
"Washington, D. C., May 31, 1892.
"Sir: An order has been issued, appointing you a railway postal clerk, class one, between New York, N. Y., and Chicago, Ill., for a period term of six months from date, pay at the rate of $600 per annum, vice Oliver M.

Smith, appointment expired. Your pay office will be at Syracuse, N. Y. Execute and return the inclosed oath before entering upon the duties of your office.      Very respectfully,

"James E. White, General Superintendent."

The plaintiff qualified and entered into the service under said order. His run was over the defendant's road, between Syracuse and Albany. His duties did not commence until the train left Syracuse, at 8 o'clock in the morning, when he went to Albany on the defendant's train, where he was transferred to a west-bound train, known as "No. 11," which reached Syracuse at 5:40 a. m., where his duties ceased. He left the train, and registered in a book in which mail clerks were required to enter their names at their destination. He was then free from duty until evening, when the same route was gone over again. Train 11 was a west-bound mail train, made up of mail and express cars, and one sleeper at the rear end. No passengers were admitted into this sleeper, except those having tickets for Rochester. Train 11 did not stop at Lyons, except for coal and water, which it took at the coal chute east of the passenger station at that place. There was a passenger train leaving Syracuse in the morning at about 7 o'clock, which the plaintiff was at liberty to take to his home at Lyons. Early in June, 1892, when the plaintiff commenced this service, he chose to continue on train 11, from Syracuse to Lyons, in the mail car. He testified that he was instructed by the conductor to get off the train when the train stopped for coal and water, and that he knew that it did not stop at the passenger station at Lyons. There were four main tracks of the defendant's road at Lyons, numbered from south to north, the south track being No. 1. That track was used for the east-bound passenger trains; No. 2, for west-bound passenger trains; No. 3, for west-bound freights, and No. 4, for east-bound freights. Still further north there were switches. The tracks were spanned by a coal chute 92 feet in length across the tracks, and 36 feet and 8 inches wide, measuring with the track. There were three spans,—the south span, 36 feet 6 inches long; the center span, 26 feet 6 inches; and the north span, 26 feet. From the track to the underside of the chute was 16 feet and 2 inches in the clear. There were an engine room and pumping station south of track No. 1, and adjoining the chute, their west faces being in line; the length of the pumping station, parallel with the track, being 60 feet. Still further east, along the south track (No. 1), were a couple of water tanks, standing on posts, and disconnected from each other; and from the pumping station, looking west from this chute in a direct line, was the passenger station, on the south of the railroad, and next to track No. 1, and beyond, still, a plain stretch of track, in a direct line, for a long distance; and trains could be plainly seen, coming from the west, by a person under the chute, the distance of 1,800 feet. The time of the arrival of train 11 at this coal station was 6:40 in the morning. The time of the arrival of a swift passenger train going east at the Lyons station, and at the same chute, was train 20, which arrived at 6:40, being the same time as the other train. Both trains took coal and water at the same chute; the train going east (No. 20) taking water at the west end

of the chute, and the train going west (No. 11) taking water at the east end of the chute. While train 20 was taking water the body of its passenger cars, in the rear, would be opposite the passenger depot, or nearly so. The body of train 11 would, according to the number of cars, extend east on track No. 2 from the chute. The plaintiff had been in the habit, from the time he entered this mail service until the 7th of August, 1892, of leaving train 11, on the east side of the chute, walking along the track westward, passing through the chute to the east end of the passenger depot platform, which was about two feet from the west side of the chute, and then passing along the platform of the depot to a street west, called "Geneva Street," and thence to his home. Another mail agent, by the name of Palmer, who resided also at Lyons for several years prior to the time of the plaintiff's entering the mail service, whose duties had taken him eastward from Syracuse, had come in on this train 11 to his home, and left the train while it was taking coal or water, and passed up through the chute in the same manner as the plaintiff had done. Testimony was given showing that, in a few other instances, persons upon train 11 had left the train at that point, and taken the same course to the village. On the south of these railroad tracks, and about 100 feet from track No. 1 in the village of Lyons, was a street called "Franklin Street," running parallel with the railroad, at a considerable distance east and west of the chute. Between track No. 1 and this street was another railroad, with one or two tracks, called the "Geneva & Lyons Road." There was a fence between this road and Franklin street. On the morning of the 7th of August, 1892, the plaintiff left train 11 while it was taking water at this chute, at a point 250 feet east of the chute. He was aware of the fact that train 20 was due at the time, and that it came down on track No. 1 and took water as above stated. When he left the train he could have passed over upon Franklin street, and thus to his home, or he could take the course which he had been accustomed to take, as above stated. We will now give the plaintiff's statement as to his experience, and its unfortunate results, as appears by his testimony:

"I had seen the scheduled time of my train here at Lyons. It was at 6:40. I did not know the scheduled time of train 20 here, but I knew it was pretty close to 6:40. I did not know 6:40 meant leaving time. * * * We arrived in Lyons that morning on time. Whether I asked the conductor, or some one on the train, and he said we were on time. My eyesight is good. I can see pretty well. My hearing is all right. I was thirty-six years old at the time. I was an active man. * * * This injury occurred Sunday morning, August 7, 1892. I got into Lyons at 6:40, on time, and when the train stopped I got off; that is, I got out onto the platform, and looked both ways, after coming out onto the platform, down on the steps. Then I discovered that I had left a paper back in the car, that I had bought at Syracuse. I went back after this paper. Then I came out, and looked up and down, both ways, again. Saw no train in sight. Jumped down on the ground, walked along, naturally, as I always had, towards the depot, and walked up the track; that is, I couldn't tell whether I was between the two tracks, or whether I was part of the time on the rails, between the rails. I was picking out the best way of walking along up through there. There wasn't any very bad. Still, I was picking out the best. And I got up within fifty feet of this coal trestle; that thing across the coal chute; that trestle across the track. Then I went

into it. I went then across track number one, to the south of track number one, and was entirely off the track; walked along the side of the pump house; and just then they swung the pump (the water pipe) out on the engine on the mail (train 11),—swung that back; and I stopped for a second to let the water go by, so I wouldn't get wet. I got wet there once. Comes out very strong; great rush. At the time I was going up the track I was looking for this train (train 20), because I had seen it come down before,—seen it go out from under the coal chute, about ready to leave, some mornings when we came in,—and I kept watching for the train all the while. Once in a while I kept looking east. Still, I didn't expect nothing from the east. I went up under the coal chute, or started to go under it. I looked to the west, and saw no train. I got under, and just as I got under the mail was ready to start, so that they made a puff of smoke (steam or smoke and cinders), and it came over there,—a volume of smoke that would smother anybody. I couldn't see anything. I grabbed my hand down over my eyes; stood there, perhaps, a few seconds, when I heard a rumbling, a noise over this dumping coal; a natural noise than an engine makes, any way, and this engine— I heard this noise, and didn't know what was the trouble, only knew I must be in danger there. I couldn't move either way; bad walking; all wet; ties dug out, and water and everything under there. I didn't know which way to move, and in a second, or two seconds, as I stood there, this train (train 20) came in and hit me, and I did not realize anything until I found I was under the engine. I realized I was under the engine after I was under it. I hallooed for help to take me out from under the engine. They carried me out. They took me into the pump house."

### Again he testifies:

"The number of the train that run into me was No. 20. It is called the 'North Shore Limited.' I don't know whether both trains were scheduled to stop at Lyons. I knew we were scheduled to stop at 6:40, but I had no occasion to know about the other train, only I had seen it come in. I had seen it come in and be there along about our time, and sometimes it would be there later. When I would go up and cross the crossing, be up by the bridge somewhere, sometimes it would be coming very fast; sometimes we stopped at the lower crossing, sometimes be coming down very slow. * * * As you come up along there, there is nothing along the tracks, only these two water tanks. At that time there were two water tanks, and one little switch shanty, or hand-car shop, and then the pump house. The pump house is on the south side of the track. The coaling station, of course, runs right across. The water tank,—one of them joins the pump house, and one perhaps thirty or forty feet from it, and both on the south side of the track. There is four or five feet space between the south rail of No. 1 track and the pump house, where you have to go through under the chute. I couldn't tell just the number of feet. I had gotten off there before. Always got off there. Never got off at any other point, with the exception of the one time that I jumped off at the station. There was no other way for me to get to the station than to go up through the coal chute, unless I went around on the other track, or cut across over the highway."

### Upon his cross-examination he testified:

"I knew at the time I got off that train that I was supposed to be in a dangerous place; that is, a man would want to be looking all the while,—watching himself."

### Again he says:

"During the two months that I did this walking up there every morning, I don't know how many times No. 20 came in. I saw it come down there. I couldn't tell you how many times. * * * I never paid much attention to it,—more than I was watching it all the time. Sometimes it came in while I went up there. I have seen it stand under the chute when we came in. * * * I think I have seen it coming in when I was getting off of my train. Sometimes it would come to a dead stop up above the crossing. Of course, I couldn't tell at that distance whether they were moving or not. Sometimes

it would be coming fast, and sometimes slow. It was coming in there always, according to my understanding of it. I have never been compelled to step aside to get off the track when that train would be coming, that I remember. I think I did once or twice. * * * You could walk along there in perfect safety for a little ways,—perhaps one hundred and fifty feet, up to the point where the water tanks were. You couldn't walk under the trestle very well,—not under the coal chute very well,—when that train stood there, unless you wanted to get in between the two."

He also stated—but he was not certain—that when he started to go under the coal chute he was between the track and the pump house. He testified also that when he was upon this train he was subject to the orders of the head postal clerk of that train, who might set him at work if he chose to. It does not appear that the head clerk ever exercised that privilege, but it does appear that the principal duties of the mail clerks from Syracuse to Lyons, upon train 11, were in washing up, and preparing to leave the train at their home.

The learned judge, at the trial, submitted the case to the jury upon the theory that the plaintiff was a passenger upon this mail train, who had been received as such to be carried to Lyons, and that as the defendant had provided no other place for the plaintiff to alight from the train and go to his home, at Lyons, than at some point east of the coal chute upon the defendant's tracks, the jury might find from the evidence that a custom had been established, to the knowledge and with the acquiescence of the defendant, that the passengers delivered at that point could proceed westward along the track, through the chute, and up to the depot platform; that there was evidence that train 20, on the morning of the accident, came in faster than usual, and from that circumstance the jury might find negligence on the part of the defendant; that the remaining question for them to consider was as to whether the plaintiff had been guilty of negligence contributing to the injury; that notwithstanding the fact that it was a bright morning, and train 20 was coming directly in front of the plaintiff as he was walking along the track, and he could see the train at a considerable distance by simply looking, still, as there was a puff of smoke that blinded his vision for a time, and as there was considerable noise in the chute, from a couple of engines standing there, the rattle of coal, etc., the jury might find the defendant free from contributory negligence. And the respondent stands, upon this review, upon the ground thus assumed by the trial court. Exceptions to the refusal of the trial court to nonsuit, and to the charge of the court, bring the questions we shall consider before us.

We must measure the duties and obligations of the parties in this case by the circumstances under which the plaintiff was transported from Syracuse to Lyons. At the time of the accident the plaintiff was not in charge of the mail on this train 11. His duties ended at Syracuse. If any contract is to be implied from these circumstances, it can only be that the plaintiff should be carried from Syracuse to Lyons; that he, when delivered at the point indicated, should take care of himself. The defendant's responsibility there ended, except, perhaps, for acts of negligence. There is no evidence in this

case of such gross negligence, or any wanton conduct, on the part of the defendant or its employés or agents. Train 20 came in upon the track assigned to it, in substantially the usual way, upon its time. It was moving into the chute to take water in the usual way, some of the evidence only indicating that it was going a little faster than usual. The plaintiff testified that it sometimes came fast, and sometimes slowly, into the chute. It is true that for some time persons getting off of this train at the point where the plaintiff did had taken the same route, and had not been injured. The defendant had taken no affirmative action to prevent this. It was not bound to. At most, these parties were implied licensees upon the track, and not trespassers. It is well settled that a railroad company owes no obligation of active care or vigilance to such licensees. Sutton v. Railroad Co., 66 N. Y. 243; Nicholson v. Railway Co., 41 N. Y. 525; Cusick v. Adams, 115 N. Y. 55, 59, and cases cited at pages 59 and 60, 21 N. E. 673; Chenery v. Railroad Co. (Mass.) 35 N. E. 554; Ward v. Pacific Co. (Or.) 36 Pac. 166; Burg v. Railway Co. (Iowa) 57 N. W. 680.

The more serious question in this case is as to the plaintiff's own negligence, and upon this subject there is no conflict in the evidence, nor can there be any question as to the inferences to be derived from the evidence. The plaintiff, when he entered that chute upon the time when No. 20 should have arrived there,—knowing that it was likely to arrive at any moment; knowing that escape from track 1 would be very difficult, as track 2 was occupied by the train in which he had arrived, and that the south side of track 1 was hedged in by the pump station for a distance of 60 feet, with a very narrow space between it and track 1,—took his life in his hands, so to speak, and assumed the consequences of his rash act. He seemed to rely upon his ability to see the train, and he says he was unable to see it on account of a puff of smoke from the engine that had brought him to Lyons. He says that after he got into the chute the walking was difficult. This liability to obscure his vision, and to interfere with his locomotion, and that the noise of the locomotives might prevent his hearing the incoming train, he well understood. In short, he knew that the senses which he expected to rely upon for his protection in so perilous a place might, through conditions he could well anticipate, become of no avail to him. The difficulties of his situation, and the risks he assumed, are graphically described by his learned counsel in his points, which are well supported by the evidence, and are as follows:

"It is necessary that the court should appreciate the locality where this accident occurred. In going westerly from the train to the station, as plaintiff was going upon the morning in question, one would encounter first, upon the south side of the track, the water plug or pumping station. This is twenty-three feet east of the coal trestle proper. Adjoining it to the west is the coal trestle forty-one feet in length, consisting of three strands, forming an arch or covering over the tracks. Next westerly is another water plug,—the whole structure being ninety-two feet in length. The roof of the structure was sixteen feet above the tracks. Between track one and the structures on the south there is a space of but three feet seven inches. The platform extending easterly from defendant's station practically adjoins the westerly pumping station. which is next westerly of the trestle, the distance between the

pumping station and platform being two feet. The water plugs themselves, which are included in the distance of ninety-two feet of the whole length of the trestle, are forty-one feet apart. In order to go, therefore, from the easterly water plug to the station platform, plaintiff had to walk a distance of about ninety-five feet, and when upon the platform he was off the track and safe. While within the trestle, upon this occasion, he could not get out of the way of a train upon track one by moving southerly of the track towards the wall of the trestle, because the space there was but three feet seven inches wide. He could not move to the north, because the mail train stood upon track two, extending so that the engine was almost opposite the east end of the platform. Unless, therefore, he happened to be opposite the three-foot door going into the engine room located in the trestle, or opposite one of the steps of the mail train, so as to jump upon it, there was no way for the plaintiff to escape being struck upon track one, after going within the trestle, unless he could reach the platform in safety ahead of it, or unless he retraced his steps and went back eastwardly outside of the trestle. Within the trestle itself there are located seven tracks; the four southerly being the regular tracks east and west bound; the three northerly being switch tracks. Upon the morning in question there was within the trestle this mail train, the engine of which was receiving water at the westerly plug, and which had been standing there some three or three and one-half minutes when plaintiff entered the trestle. Upon the next northerly track was another engine being coaled, and making a noise. Another engine, which had been coaled and watered, was standing, ready to move, upon the south side of the tank house. Within the trestle were the engines and pumps in operation, and, of course, making more or less noise."

This description is contained in that portion of the counsel's argument in which he seeks to show the difficulties of the plaintiff's situation, as a reason for increased care on the part of the defendant; but it will be seen that he (unconsciously, perhaps) furnishes in this statement a conclusive argument to show that his client was guilty of contributory negligence of such a character as cannot be disregarded in the disposition of this case. The difficulties here described, the plaintiff well understood when he encountered them; and if we assume that he was a passenger, and had all the rights of a passenger, still this negligence of his would defeat his recovery. It is true that the question of contributory negligence, where there is conflicting evidence, or where the inferences from the evidence may lead to different conclusions, is for the jury; and but few cases arise, comparatively, where the court is authorized to find contributory negligence as a matter of law. Where, however, from the undisputed evidence in the case, the inference of contributory negligence is irresistible and conclusive, it is the duty of the court to so determine. The conclusion reached upon this question renders it unnecessary to consider the question as to whether the plaintiff was entitled to all the rights of a passenger upon a passenger train.

We will notice but a single exception taken upon the trial to the admission of evidence. The plaintiff was asked, upon his examination, if he had any other certificate, of any kind, entitling him to ride on defendant's trains, issued by the government (referring to any certificate other than his appointment hereinbefore set forth). Defendant's counsel objected as incompetent and as immaterial, and not the best evidence. This was overruled, and the defendant excepted, and the witness answered: "I did, after; yes, sir." The objection to this evidence is manifest. It proved by a conclusion of

the witness that he had some authority or certificate, from the government of the United States, authorizing him to ride upon the defendant's train in connection with the mail service. No such certificate was presented, or its absence accounted for, or its loss shown; and it was manifestly improper, and might, and probably did, influence the jury, and is reversible error.

These views lead to the conclusion that the judgment and order appealed from should be reversed, and a new trial granted, with costs to abide event. All concur.